UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREGORY HARLEY,<br><br>    Plaintiff,<br><br>v.<br><br>VERIZON WASHINGTON, D.C. INC.,<br><br>    Defendant. | Case No. 20-cv-857 (JMC) |

### MEMORANDUM OPINION

Plaintiff Gregory Harley worked as a services technician at Verizon. That physically demanding job required him to install and maintain equipment. After he injured his shoulder while working, he was unable to do what the job required of him. Verizon then spent months trying to find Harley another job at the company. But the company was ultimately unable to match Harley with an available position for which he was qualified. So, at the end of the period of unpaid leave Harley was guaranteed by his collective bargaining agreement, he was fired. Harley then sued Verizon under the Americans with Disabilities Act (the ADA) alleging Verizon failed to provide him with reasonable accommodations. Because there is no dispute that Verizon fulfilled its obligations under the ADA, the Court **GRANTS** Verizon's motion for summary judgment.[1]

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

I.  **BACKGROUND**

Gregory Harley began working at Verizon as a services technician in 1997. ECF 24-2 ¶ 1; ECF 25-1 at 1. Services technicians "are responsible for installing and maintaining residential and business telecommunications services." ECF 24-2 ¶ 3; ECF 25-1 at 1. That requires "[c]onnecting, disconnecting, reconnecting, testing, repairing, maintaining, installing, rearranging company and customer provided telephones and equipment, inside wiring, and wires at poles, underground or building terminals." ECF 24-2 ¶ 3; ECF 25-1 at 1. To work as a services technician, applicants must pass a test and "be able to perform [the] physical requirements of the job." ECF 24-2 ¶¶ 1, 3; ECF 25-1 at 1. Those physical requirements include "moving and/or lifting items such as ladders, tools, cable, test equipment and other objects weighing up to 100 pounds, working aloft; climbing ladders and poles, and entering tunnels, buildings, trenches, crawl spaces, manholes, and other confined spaces." ECF 24-2 ¶ 3; ECF 25-1 at 1.

Between 2013 and 2015, Harley suffered three job-related injuries, each of which rendered him—at least temporarily—unable to perform his duties as a services technician. ECF 24-2 ¶¶ 19–29; ECF 25-1 at 6–8. The last of those injuries gave rise to this case. In December 2015, Harley injured his shoulder. ECF 24-2 ¶ 26; ECF 25-1 at 8. That left him unable to perform the essential functions of the services technician position. ECF 24-2 ¶ 27; ECF 25-1 at 8. Harley then took a period of "short-term disability leave" before returning to work at Verizon. ECF 24-2 ¶ 26; ECF 25-1 at 8. When Harley returned in early February 2016, he still could not do the tasks required of a services technician, so Verizon placed him in the medical leave program it had negotiated with his union. ECF 24-2 ¶ 27; ECF 25-1 at 8.

Under the medical leave program, Harley was initially provided with "light duty work." ECF 24-2 ¶ 27; ECF 25-1 at 8. But, per the program's terms, that period of "light duty work" would end in April 2016. ECF 24-2 ¶ 29; ECF 25-1 at 8. While employees were entitled to a total

2

of 52 weeks of light duty work over a two-year period, Harley had already used up the majority of his time while recovering from his previous injuries. ECF 24-2 ¶ 28; ECF 25-1 at 8. So, after around two months of paid light duty work, Harley was put on unpaid leave. ECF 24-2 ¶ 31; ECF 25-1 at 8. Harley could then remain on unpaid leave for up to 52 weeks, less the 150 days he had already spent on light duty, which counted towards the 52 weeks. ECF 24-2 ¶ 14; ECF 25-1 at 4.

In June 2016, around two months after he went on unpaid leave, Harley had surgery to repair his shoulder. ECF 24-2 ¶ 32; ECF 25-1 at 8. Harley claims that surgery "was delayed by Verizon for over two months based on non-medical considerations." ECF 25-1 at 7; *see id.* at 27 ¶ 8. Verizon says otherwise, relying on e-mails in which the surgery was approved. Those emails show that in May 2016 Harley's treating physician sent Verizon's third-party workers' compensation vendor a request to approve his surgery scheduled for June 2016. *See* ECF 26-1 ¶ 3; ECF 26-1 at 5–12 (e-mail exchanges regarding surgery claim). Verizon then approved the surgery and it occurred, as scheduled, on June 16. ECF 26-1 at 5–12.

As the Court will explain below, there is no need to decide whether there is a genuine dispute about the timing of Harley's surgery. What is undisputed is that Harley had surgery in June 2016, and that after his surgery he went back onto short-term disability leave for around four months. ECF 24-2 ¶¶ 32–35; ECF 25-1 at 8–9. When Harley returned to work in October, he was then placed back on unpaid leave. ECF 24-2 ¶¶ 35–36; ECF 25-1 at 9. He now had about 150 days left of his 52 total weeks on the medical leave program. ECF 24-2 ¶ 36; ECF 25-1 at 9.

Throughout the time that Harley was on that program—first on light work duty, and then on unpaid leave—he was entitled to "priority placement" into any vacant lateral or downgrade position within a certain geographical radius that he could perform with or without reasonable accommodations and—if the position required passing a test—for which he was (or could become)

test-qualified. ECF 24-2 ¶¶ 15, 18; ECF 25-1 at 4, 6. "Priority placement" meant that Harley would be automatically offered any vacant position for which he was qualified, except that other medically restricted employees would jump him in line if they were more senior. ECF 24-2 ¶ 16; ECF 25-1 at 4.

In total, Verizon matched Harley with more than 40 "priority placement" positions at the company, *see* ECF 24-5 at 56, though for various reasons he was not ultimately placed into any of them. For many of the positions, the same physical limitations that prevented Harley from working in his current position meant that he could not perform the essential functions of the new job either. *See* ECF 24-2 ¶¶ 38, 39, 40; ECF 25-1 at 10. For two other categories of positions, Harley was provided the opportunity to take a written assessment test to become "test-qualified," but failed the exam and was not eligible to retake it for six months (which would not come until after his 52 weeks on the medical leave program ran out). *See* ECF 24-2 ¶¶ 42–44; ECF 25-1 at 10. Near the end of his 52 weeks, Harley was matched with two maintenance administrator positions, one of which was cancelled before it was filled, the other of which was filled by a more senior medically restricted employee. *See* ECF 24-2 ¶ 48; ECF 25-1 at 11. Finally, Verizon offered Harley the opportunity to test for two out-of-state customer support positions, but Harley declined because the positions were too far away. *See* ECF 24-2 ¶ 47; ECF 25-1 at 11.[2]

So Harley did not find another position while he was in the medical leave program, and on April 4, 2017, Verizon informed him that he had exhausted his allotment of unpaid leave. ECF 24-2 ¶ 49; ECF 25-1 at 11. Harley was terminated the next day. ECF 24-2 ¶ 50; ECF 25-1 at 11. After

---

[2] The parties note that Harley's union went on strike for approximately seven weeks during the spring of 2016, during which time the company took down all job postings and there were "very few" vacant positions at the company. ECF 24-2 ¶ 30; ECF 25-1 at 8. At one point in the briefing on the motion for summary judgment, Harley intimates that the company's failure to place him into a new position was partially attributable to that strike. ECF 25 at 2–3. Because the claims before the Court are solely under the ADA, that possibility is beyond the purview of this case. Moreover, Harley cites to no evidence that would support that contention.

filing a grievance with his union (which was denied, and which his union chose not to appeal), *see* ECF 24-2 ¶ 51; ECF 25-1 at 11, Harley filed this suit, contending that Verizon violated the ADA when it failed to provide reasonable accommodations for his disability, resulting in his wrongful termination. ECF 1. Verizon moved for summary judgment, arguing that it fulfilled its obligations under the ADA. *See* ECF 24.

## II.   LEGAL STANDARD

The Court will grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

## III.   ANALYSIS

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Harley contends that Verizon violated this provision by failing to provide him with a reasonable accommodation that would have allowed him to continue working at the company either (1) as a services technician or (2) in another position to which he could have been reassigned. Harley also protests that Verizon failed to engage in an "interactive dialogue" with him for the purpose of identifying a reasonable accommodation. ECF 25 at 6. Because it is undisputed that there was no accommodation with which Harley could perform the essential functions of the services technician role and no position to reassign him to for which he was qualified, Verizon is entitled to summary judgment.

A. **Verizon did not violate the ADA by failing to retain Harley as a services technician.**

Verizon says there is no evidence that any accommodation would have made it possible for Harley to "perform the essential functions" of the services technician role. 42 U.S.C. § 12111(8). Because an employer need not retain someone in a job unless they are able to "perform [its] essential functions," the company concludes, it did not violate the ADA by refusing to allow Harley to remain in that role. *See Stanley v. City of Sanford*, 145 S. Ct. 2058, 2071 (2025) (a plaintiff can only prevail on ADA claim if she can "prove that she . . . c[an] perform [a job's] essential functions"). The Court agrees.

In determining the "essential functions" of an employment position, the ADA directs courts to "consider[] . . . the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8). And "if an employer has prepared a written description before advertising or interviewing applicants for the job, th[at] description shall be considered evidence of the essential functions of the job." *Id.* Verizon had prepared a written description for the job, which lists its "basic qualifications." ECF 24-4 at 47–48. These include, "but [are] not limited to":

> moving and/or lifting items such as ladders, tools, cable, test equipment and other objects weighing up to 100 pounds, working aloft; climbing ladders and poles, and entering tunnels, buildings, trenches, crawl spaces, manholes, and other confined spaces to accomplish job tasks.

*Id.* at 47. For his part, Harley concedes that these were requirements of the role. *See* ECF 24-2 ¶ 4; ECF 25-1 at 1. Given the job description and the parties' agreement that these tasks were required of services technicians, the Court has little trouble in concluding that they constitute "essential functions" of the role for purposes of the ADA. Both parties also agree that, due to his shoulder injury, Harley could not meet the 100-pound lifting requirement. *See* ECF 24-2 ¶ 34; ECF 25-1 at 9. That means that, unless Harley has identified some "reasonable accommodation" that would

6

have made it possible for him to lift the required amount, he cannot prove he was qualified for the services technician role.

In his opposition to Verizon's motion for summary judgment, Harley insists that there was such an accommodation: Verizon, he says, could have provided him with a "workvan with Ladder Assist equipment." ECF 25 at 6. Ladder Assist, he explains, uses "pressurized gas shocks [that] support the weight of the ladder" and therefore "assist[s] in lifting and lowering the ladder." ECF 25-1 at 26. Harley argues that this technology would have obviated the need "to make extreme lifts of heavy equipment such as ladders onto the top of a van," and therefore would have rendered him qualified to perform the essential functions of the job despite his inability to lift 100-pound ladders. ECF 25 at 6; *see also* ECF 25-1 at 27 (Harley's declaration claims he can "currently . . . carry and lift up to 100 pounds," but still cannot "lift extremely heavy items, such [as] 100-pound ladders, onto the top of vans without the use of Ladder Assist").

The problem for Harley, however, is that he needs to prove he "could perform [the] essential functions" of the services technician role with a reasonable accommodation "at the time of [Verizon's] alleged act of disability-based discrimination." *Stanley*, 145 S. Ct. at 2071; *see also Minter v. District of Columbia*, 809 F.3d 66, 70 (D.C. Cir. 2015) ("The plaintiff must establish her ability to perform those functions . . . at the time the employer denied her request for accommodation."). That means Harley needs to identify a reasonable accommodation with which he could have done the job between December 2015—when he was injured—and April 2017—when he was terminated. That is the period in which he claims Verizon discriminated against him by failing to accommodate him in the services technician role and, ultimately, firing him.

But Harley never claims, and there is nothing in the record to suggest, that Ladder Assist was in use or available to Verizon in that time period. Instead, Harley's declaration—which is the

only mention of Ladder Assist anywhere in the record—claims only that "all vans that are purchased by Verizon *now* have Ladder Assists." ECF 25-1 at 26 (emphasis added); *see also id.* at 27 (describing his inability to do certain tasks "without the use of Ladder Assist equipment that is *now* in place at Verizon" (emphasis added)). That declaration was signed in April 2022—five years after Harley was fired. Because neither the declaration nor anything else in the record suggests there was an accommodation available between 2015 and 2017 with which Harley could have performed the essential functions of the services technician job, Verizon did not violate the ADA by failing to retain Harley in that job.[3]

Harley also suggests that Verizon delayed in approving his shoulder surgery and that, had it not done so, he may have been able to perform the essential functions of the job before his unpaid leave ran out and he was terminated. *See* ECF 25 at 5. But even assuming Verizon did cause some delay in his procedure, he has not explained how that claim is cognizable under the ADA.[4] Title I of the ADA prohibits discrimination in the provision of "employee compensation . . . and other terms, conditions, and privileges of employment," which could perhaps cover discrimination in the approval of the surgery. 42 U.S.C. § 12112(a). But Harley has completely failed to develop any argument to that effect. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) ("A party forfeits an argument by mentioning it only in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

---

[3] Verizon also argues that Harley's declaration "contradicts his sworn deposition testimony" and should therefore be disregarded. ECF 26 at 1. Because, even taking the declaration at face value, it does not create a genuine dispute about the relevant material fact—whether there was a reasonable accommodation with which Harley could have done the job *at the time he claims to have been discriminated against*—the Court need not decide whether that's right.

[4] The record suggests that Verizon did not in fact cause any delay. Although there was some confusion about the scheduled date of the surgery within the third-party company that Verizon used to process the approval, that company ultimately approved the surgery for June 16, the same day that the orthopedic surgeon said it was "set for." ECF 26-1 at 8. And the request for approval was submitted to that third-party company on May 19, so Harley's surgery was approved and completed within one month of the request. *Id.* at 12.

8

Even if Harley had tried to develop that argument, it would likely have amounted to an improper amendment of his complaint. The only claim in his single-count complaint is that "Verizon terminated and disqualified" him from "employment" based on his disability. ECF 1 at 7. He did not say a word about any delay to his surgery, and certainly did not bring a claim alleging any such delay amounted to illegal discrimination. To allow Harley to press that claim now would be to allow him to impermissibly "amend his complaint in an opposition to a defendant's motion for summary judgment." *Thorp v. District of Columbia*, 319 F. Supp. 3d 1, 20 (D.D.C. 2018).

There is therefore no genuine dispute of fact: No reasonable accommodation would have enabled Harley to perform the essential functions of the services technician position at the time he was fired. That means Verizon did not violate the ADA by failing to retain Harley in that position.

**B. Verizon did not violate the ADA by failing to reassign Harley to a different position.**

Harley's second theory is that Verizon violated the ADA by failing to reassign him to another position. The company says it is undisputed that no vacant position for which Harley was qualified was available, so this claim fails too. Once again, the Court agrees.

Providing reasonable accommodations can mean "reassignment to a vacant position." *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 5 (D.C. Cir. 2010) (quoting 42 U.S.C. § 12111(9)). But the ADA does not require "that a disabled employee be reassigned to a position for which he is not otherwise qualified," and "[a]n employee need not be reassigned if no vacant position exists." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998). Applying those rules, Verizon argues that no reassignment was possible here because, despite months of searching, it could not identify any available positions for which Harley was qualified. *See* ECF 24-1 at 12. Harley, in response, insists that Verizon's reassignment efforts were insufficient. *See* ECF 25 at 7.

9

Harley is right that Verizon had an "obligation to help him identify appropriate job vacancies." *Aka*, 156 F.3d at 1304 n.27. But no reasonable jury could conclude that Verizon failed to fulfill that obligation here. Verizon placed Harley in its "priority placement" process. *See* ECF 24-2 at ¶¶ 29, 37; ECF 25-1 at 8–9. As part of that process, Verizon matched Harley with a number of positions under six job titles: (1) automotive equipment technician, (2) services technician, (3) service representative, (4) consultant, (5) storekeeper, and (6) maintenance administrator. ECF 24-2 ¶ 37. Given Harley's physical restrictions, it is undisputed that he was not qualified for the automotive equipment technician, storekeeper, or services technician roles. *See* ECF 24-2 ¶¶ 37, 38–40; ECF 25-1 at 9–10. As for the service representative and consultant positions, both required Harley to pass a test. ECF 24-2 ¶¶ 37, 41–44. It is undisputed that Verizon arranged for Harley to take that test, but Harley did not pass. ECF 24-2 ¶¶ 42–43; ECF 25-1 at 10. Verizon thus had no legal obligation to reassign Harley to any of these five titles for which he was not qualified. *See Aka*, 156 F.3d at 1305.

Verizon continued to work with Harley to identify open positions right up until the end of his employment. In February 2017—at Harley's request—Verizon identified two out-of-state customer support positions that Harley declined to pursue because they were too far away. *See* ECF 24-2 ¶ 47; ECF 25-1 at 11. And in March 2017, the month before his leave expired, Verizon matched Harley with two maintenance administrator positions, but the company opted not to hire anyone for one of the roles and the other was filled with a more senior employee on medical leave who was also searching for a new role. ECF 24-2 at ¶¶ 37, 48; ECF 25-1 at 9–11. *See Harris v. Chao*, 257 F. Supp. 3d 67, 76 (D.D.C. 2017) ("[R]eassignment can only be to an existing, vacant job for which the plaintiff is qualified, and positions to which other employees have a legitimate

contractual or seniority right are not considered vacant."). Verizon's efforts, in terms of both diligence and duration, were enough to satisfy its obligations under the ADA.

In the face of this undisputed evidence of Verizon's diligence in trying to reassign him, Harley identifies three would-be disputes of fact: 1) that Verizon never informed him of a preparation course that could have improved his ability to pass qualifying tests; 2) that Verizon only gave him the opportunity to test for certain customer support positions; and 3) that Verizon's delay in approving his surgery excluded him from consideration for 40 vacant positions available during the summer of 2016. *See* ECF 25 at 4. None of these creates an issue that precludes summary judgment.

First, Harley claims that Verizon did not proactively provide him with home study materials for a "Universal Test Battery," which "could have prevented him from failing the first and only assessment test that he was given almost a full year after his injury." ECF 25 at 7. But a Verizon employee explains in a declaration that Verizon "stopped using the Universal Test Battery . . . in 2009," and Harley has not pointed to anything in the record that undermines that claim.[5] ECF 26-2 at 3. As that same declaration also explains, Verizon did offer training for the test it actually administered at the time Harley was seeking reassignment, but it was Harley's "responsibility" to access that training on the "internal website" where it was posted. *Id.* Most fundamentally, Harley has cited no authority for the proposition that Verizon had a legal duty—in addition to identifying vacant positions and making available training resources—to remind him that he should make use of the test preparation resources it provided.

---

[5] Where Harley claims his supervisors should have "encourage[d]" him to "take a home study course," his only citation is to a 1998 version of Verizon's medical leave plan. *See* ECF 25 at 7 (citing ECF 25-1 at 15). What Verizon did in 1998 cannot create a dispute about whether it changed its policies 11 years later.

11

Second, Harley contends he "was not offered Fiber Customer Support Analyst positions in New Jersey and Delaware, he was only offered the option to test for those positions." ECF 25 at 7. But Harley has not pointed to any evidence that the tests were not prerequisites for those roles. In making this offer, then, Verizon was doing exactly what the ADA requires. *See Aka*, 156 F.3d at 1305 ("[T]he ADA does not require that a disabled employee be reassigned to a position for which he is not otherwise qualified."). Moreover, Harley declined to pursue the New Jersey and Delaware openings because "both locations [were] too [far] for [him]." ECF 24-4 at 117; *see also* ECF 24-2 ¶ 47; ECF 25-1 at 11. Having declined to pursue these positions altogether, Harley cannot now claim that Verizon's failure to put him in either position violated the ADA.

Finally, Harley's reliance on the purported delay in his surgery fails for the same reasons it cannot rescue his claim that he should have been retained as a services technician. Once more, Harley has not explained how—even were it true that Verizon delayed his surgery—that would be actionable in this ADA case. Because Harley has failed to create a genuine dispute about whether there was a vacant position at Verizon for which he was qualified, and because the undisputed evidence shows that Verizon made an "active effort" to identify any such positions, *Aka*, 156 F.3d at 1304, Harley's claim that Verizon violated the ADA by failing to reassign him fails.

C. **Harley cannot make out a claim that Verizon failed to engage in an interactive process to identify an appropriate accommodation.**

Finally, Harley asserts that Verizon violated the ADA by failing to engage in an "interactive process" to assist him in identifying a reasonable accommodation. ECF 25 at 3–4, 6. But Harley's failure to create a genuine dispute about his first two theories dooms this third one.

"To determine the appropriate reasonable accommodation[,] it may be necessary for [an employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation." *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (quoting 29 C.F.R.

12

§ 1630.2(o)(3)). This process is a "procedural means" to meet the "substantive accommodation ends" of the ADA. *Ali v. Regan*, 111 F.4th 1264, 1274 (D.C. Cir. 2024). But the "interactive process . . . is not an end in itself." *Id.* That's why "there is no independent cause of action for failure to engage in the interactive process," but instead "there is only a cause of action for failure to accommodate generally." *Husain v. Power*, 630 F. Supp. 3d 188, 200 (D.D.C. 2022) (collecting cases). Thus, "there can be no failure to accommodate where no accommodation was available (e.g., where there was no suitable vacancy) at the relevant time." *Id.*

As the Court has explained, Harley has failed to create a genuine dispute about whether there was such an accommodation available. Because Harley "has not—even after a full opportunity for discovery—made *any* showing of a vacant position to which [he] could have been reassigned" or any accommodation with which he could have performed the essential functions of his prior position, Harley cannot prove his ADA claim. *Husain*, 630 F. Supp. 3d at 201; *see also Jones v. Univ. of D.C.*, 505 F. Supp. 2d 78, 91 (D.D.C. 2007) ("[A] defendant can still prevail on summary judgment despite its failure to engage in the interactive process if the plaintiff fails to show that a reasonable accommodation was possible.").

\* \* \*

Verizon's motion for summary judgment, ECF 24, is **GRANTED.** A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
Jia M. Cobb
U.S. District Court Judge

Date: September 29, 2025